# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1352

_____

Timothy Johnston,

   Appellant,

  v.

Al Luebbers,

   Appellee.

\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* Eastern District of Missouri.
\*
\*
\*

_____

Submitted: September 10, 2001
Filed: May 1, 2002

_____

Before BOWMAN, HEANEY, and BYE, Circuit Judges.

_____

BOWMAN, Circuit Judge.

  Timothy Johnston appeals from the District Court's[1] denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. We affirm.

---

[1]The Honorable Donald J. Stohr, United States District Court Judge for the Eastern District of Missouri.

I.

Johnston was convicted of first-degree murder and armed criminal action in Missouri state court in 1991 for the beating death of his wife. A jury sentenced Johnston to death. The facts underlying Johnston's conviction are discussed thoroughly by the Missouri Supreme Court, see State v. Johnston, 957 S.W.2d 734 (Mo. 1997) (en banc), cert. denied, 522 U.S. 1150 (1998), and we see no need to restate those facts here. After the jury convicted Johnston and sentenced him to death, he took a timely direct appeal to the Missouri Supreme Court and also, pursuant to Missouri Supreme Court Rule 29.15, filed a pro se motion for post-conviction relief in the appropriate state trial court. Counsel was appointed to represent Johnston in the Rule 29.15 proceedings, and that counsel filed an amended Rule 29.15 motion. The post-conviction court denied Johnston's motion in September 1996, and shortly thereafter Johnston filed his consolidated appeal to the Missouri Supreme Court. In its ruling on Johnston's consolidated appeal, the Missouri Supreme Court affirmed Johnston's conviction and sentence as well as the motion court's denial of post-conviction relief. Johnston next sought habeas corpus relief in the District Court. The District Court denied relief, and this Court granted Johnston's application for a certificate of appealability with respect to seven issues. In his brief, Johnston addresses all of these issues.

Our consideration of Johnston's appeal is governed by 28 U.S.C. § 2254 (1994 & Supp. 1998), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-19. We cannot grant habeas relief on any claim "adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision

is "contrary to" clearly established federal law if the rule applied by the state court directly contradicts Supreme Court precedent or if the state court has reached a result opposite to a result reached by the Supreme Court on "materially indistinguishable" facts. Williams v. Taylor, 529 U.S. 362, 405 (2000) (concurring opinion of O'Connor, J., for the Court). We may not grant habeas relief if the state court's judgment is not unreasonable, even if, in our "independent judgment," the state court's application of the law might be erroneous. Id. at 411.

Although AEDPA directs our review of state court decisions, we apply our usual standards of review to the decision of the District Court, reviewing factual findings for clear error and questions of law or mixed questions of law and fact de novo. See Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001).

II.

Johnston argued to the Missouri Supreme Court that the state trial court violated his due process rights under the Fourteenth Amendment when it failed to clearly and accurately instruct the jury in response to a question sent out by the jury during its deliberations. Johnston argues to this Court that the Missouri Supreme Court's conclusion to the contrary is an unreasonable application of clearly established federal law because the trial court's response created a reasonable likelihood that the jury's guilty verdict was reached without a unanimous finding of the existence of each element of the first-degree murder charge.

At the close of the evidence presented during the guilt phase of Johnston's trial, the jury was instructed that in order to find Johnston guilty of first-degree murder it must find that Johnston caused the death of his wife by striking her, that Johnston was aware that his conduct was causing his wife's death, and that Johnston "did so after deliberation." The jury was instructed that "unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find

-3-

the defendant not guilty of murder in the first degree." The jury instructions also directed the jury that its verdict, "whether guilty or not guilty, must be agreed to by each juror."

During its guilt-phase deliberations, the jury sent a note to the judge which asked, "Is the jury required by law to be unanimous on each element contained in the count in order to be unanimous on that count?" Trial Tr. vol. V at 1646. Johnston requested that the judge simply respond "Yes." The court suggested responding, "yes, please refer to the instructions." Id. at 1648. The State objected to both responses. The court eventually responded, over Johnston's objections, by instructing the jury "to be guided by the instructions as given." Id. at 1653. Two and a half hours later, the jury returned a verdict of guilty of first-degree murder.

The Missouri Supreme Court rejected Johnston's argument that the trial court violated his due process rights in failing to explain further the jury's instructions. The court concluded:

> We do not find that the jury could have been misled to the defendant's prejudice by this answer, as it merely suggested to the jury that they had their answer if they would consider the correct, clear and unambiguous instructions already given.

Johnston, 957 S.W.2d at 752. The District Court similarly concluded that Johnston had failed to show how the trial court's instructions were ambiguous. Johnston v. Bowersox, 119 F. Supp. 2d 971, 986 (E.D. Mo. 2000).

Johnston argues that the Missouri Supreme Court misapplied clearly established federal law in rejecting his challenge to the trial court's handling of the

jury's question.[2] The only appropriate answer to the jury's question, Johnston alleges, was the answer he suggested. Citing Boyde v. California, 494 U.S. 370 (1990), and Bollenbach v. United States, 326 U.S. 607 (1946), Johnston argues that he is entitled to habeas relief because the trial judge's answer to the jury question created a "reasonable likelihood" that the jury misapplied the law. The Supreme Court's reasoning in Bollenbach does not provide any relief to Johnston because the instructions given by the trial court in Johnston's case do not affirmatively misstate the law, as did the instruction given by the trial court in Bollenbach. Johnston cites the correct standard of review, set out in Boyde, for cases where a habeas petitioner alleges that an "instruction is ambiguous and therefore subject to an erroneous interpretation": the defendant must show that the jury instruction created "a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380. The facts of Boyde also do not support Johnston's claim because the Supreme Court concluded that the challenged instruction was not susceptible to an erroneous interpretation. Like the District Court, we too conclude that Johnston has not identified any other applicable "clearly established federal law" that would show that the Missouri Supreme Court unreasonably determined that the guilt-phase instructions given by the trial court (including the response to the jury question) were not, on their face, ambiguous and therefore were not subject to an erroneous interpretation by the jury and did not prevent the jury from considering constitutionally relevant evidence. Johnston's reliance on the mere "fact of the [jury's] question and the potential unhelpfulness of the Court's response" are not

---

[2]Johnston argues in his brief that the District Court misapplied the Boyde test. See Boyde v. California, 494 U.S. 370, 380 (1990). We assume that Johnston intended to argue that the Missouri Supreme Court misapplied the Boyde test, as that is the argument on which he must prevail in order to qualify for habeas relief under the conditions set forth in 28 U.S.C. § 2254. See Kinder v. Bowersox, 272 F.3d 532, 552 n.13 (8th Cir. 2001).

sufficient to meet the AEDPA standard for relief on this claim. <u>Johnston</u>, 119 F. Supp. 2d at 986.

Johnston attempts to bolster his argument that the state supreme court misapplied <u>Boyde</u> by relying on <u>Weeks v. Angelone</u>, 528 U.S. 225 (2000). In <u>Weeks</u>, the trial judge responded to a jury question by directing the jury to a particular paragraph within an instruction. Johnston cites <u>Weeks</u> to argue that the trial court was constitutionally required to answer the jury's question as Johnston suggested. A careful reading of <u>Weeks</u> reveals that it stands for a different proposition: it is not constitutional error for a judge to direct the jury to a specific portion of an instruction. <u>Weeks</u> does not, notwithstanding Johnston's arguments, stand for the proposition that it is constitutional error to fail to point out a specific instruction. Johnston's reliance on <u>Weeks</u> therefore does not demonstrate that the Missouri Supreme Court's decision was contrary to or an unreasonable application of clearly established federal law.[3]

Because the Missouri Supreme Court's determination that the jury instructions were not ambiguous was not contrary to or an unreasonable application of clearly established federal law, Johnston has failed to establish that he is entitled to habeas relief on this ground.

_____

[3]Johnston also makes a due process argument, purporting to rely on <u>Hicks v. Oklahoma</u>, 447 U.S. 343 (1980). Johnston argues that the trial court violated Missouri law in failing to answer the jury's question with greater specificity, and thus it violated Johnston's due process rights. We have previously analyzed <u>Hicks</u> and rejected "the notion that every trial error . . . gives rise to a claim under the Due Process Clause of the Fourteenth Amendment." <u>Chambers v. Bowersox</u>, 157 F.3d 560, 565 (8th Cir. 1998), <u>cert. denied</u>, 527 U.S. 1029 (1999). In any case, the Missouri Supreme Court concluded that the trial court's action did not violate state law. "We will not presume to question the Missouri Supreme Court's interpretation of Missouri state law." <u>Kinder</u>, 272 F.3d at 540 n.6 (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)). Johnston is not entitled to habeas relief under <u>Hicks</u>.

III.

Johnston raises three instances of ineffective assistance of trial counsel in this appeal. The Missouri Supreme Court applied <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), to Johnston's ineffective-assistance claims, and the court laid out the correct standard:

> [C]ounsel is ineffective only if trial counsel's performance fell below an objective standard of reasonable competence <u>and</u> trial counsel's ineffective performance created a reasonable probability that, but for trial counsel's ineffective performance, the outcome of the guilt or penalty phase would have been different.

<u>Johnston</u>, 957 S.W.2d at 742; <u>accord</u> <u>Strickland</u>, 466 U.S. at 687-88, 694.

A.

During the penalty phase of Johnston's trial, his attorney presented the testimony of eleven witnesses. Eight of those witnesses were employed at the city jail where Johnston was incarcerated after his arrest for the murder of his wife. These witnesses collectively testified that Johnston had been an exemplary inmate, that he was a reliable worker, and that his jail supervisors relied on him in work settings. Johnston's mother, brother, and a cousin also testified, providing details about his childhood including his parents' divorce, his father's death, and Johnston's difficulties dealing with both events. His family also testified about his alcohol problem and how drinking caused him to act like a different person.

Johnston asserts that his counsel "failed to investigate and present substantial mitigating evidence to the sentencing jury." Appellant's Br. at 19. Although Johnston was evaluated before trial by mental health experts, Johnston's attorney did not call those experts to testify during the penalty phase. Johnston also had seen a

private psychiatrist in the months before his wife's murder, but that doctor's testimony was not presented to the jury during the penalty phase. Because this testimony, and the testimony of a number of other expert and lay witnesses identified by Johnston, was not presented, Johnston argues that he received ineffective assistance and was prejudiced thereby.

The Missouri Supreme Court held that Johnston did not receive ineffective assistance because his attorney's decisions regarding whose testimony to present were "informed and strategic," Johnston, 957 S.W.2d at 756, and counsel's assistance therefore did not fall below the standard of representation guaranteed by the Constitution. Johnston argues that the Missouri Supreme Court, in so concluding, unreasonably applied the Strickland test because counsel's decision not to present mental health and other expert testimony was not a reasonable decision regarding trial strategy.

Johnston's trial counsel testified at the Rule 29.15 hearing that he was aware of each of the mental health experts Johnston claims should have testified and that he spoke to or received written reports or notes from each of them. Johnston was evaluated before trial by two of these experts, and both doctors provided information to Johnston's counsel concluding that Johnston suffered from alcohol dependence, a history of serious head injuries, and a personality disorder, all of which caused him to be emotionally disturbed and impaired. Johnston's attorney explained that he chose not to present the testimony of these experts because of apparent inconsistencies among their reports, and because the reports contained information about other criminal acts Johnston committed and statements about his ability at the time of the murder to understand and appreciate the nature and wrongfulness of his actions. Johnston's attorney also testified that he did not seek further testing or expert testimony, such as from an expert on organic brain damage, because he relied on the other experts and they did not request further evaluations. See Six v. Delo, 94 F.3d 469, 474 (8th Cir. 1996), cert. denied, 520 U.S. 1255 (1997). In sum, Johnston's

attorney testified that he weighed the risks and benefits of calling these experts and concluded that he would not call them. The record supports the Missouri Supreme Court's conclusion that Johnston's attorney's decision not to call these witnesses was a decision about trial strategy made after investigation and consideration. See Strickland, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); Laws v. Armontrout, 863 F.2d 1377, 1384-85 (8th Cir. 1988), cert. denied, 490 U.S. 1040 (1989). We must conclude that the Missouri Supreme Court's decision is not contrary to or an unreasonable application of clearly established federal law. Johnston is not entitled to habeas relief on this basis.

Johnston claims that his attorney failed to investigate other kinds of experts who could have testified, including an expert to discuss Johnston's alcohol abuse and a childhood-development expert to discuss his troubled upbringing. The Missouri Supreme Court's opinion does not individually address these experts, but the court held, as to all ineffective-assistance claims not specifically discussed in its opinion, "that the claims not individually addressed below contained no grounds upon which a reasonable probability of outcome-determinative prejudice to Johnston—based on counsel's acts or failures to act—could be found." Johnston, 957 S.W.2d at 752. Therefore, the court held that as to these experts Johnston had failed to show sufficient prejudice under Strickland. After considering the additional evidence Johnston argues should have been presented, we conclude that the Missouri Supreme Court's determination that such testimony would not have changed the outcome of the sentencing phase is not contrary to or an unreasonable application of the governing principles found in Strickland. See Six, 94 F.3d at 475 (concluding additional mitigating evidence would not have changed sentencing equation).

Johnston also argues that the Missouri Supreme Court's factual finding regarding the cumulative nature of the lay testimony he argues should have been presented was erroneous in light of the state-court record. Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). We conclude that Johnston has not met his burden of rebutting this presumption by clear and convincing evidence. See id. The witnesses Johnston claims should have testified would have discussed his troubled childhood, his drinking problem, and his work history before he was incarcerated. The jury heard about his family and childhood from the three members of the Johnston family who testified. Trial counsel presented testimony, in several forms, about Johnston's work habits from Johnston's work supervisors at the city jail. Thus, to a large extent the witnesses whose absence Johnston challenges would have repeated testimony already elicited from Johnston's closest family members and from numerous city jail workers. It was not an unreasonable determination of the facts for the Missouri Supreme Court to conclude that this testimony was duplicative and therefore unnecessary. See Kinder, 272 F.3d at 553. We conclude that Johnston has not met his burden of showing by clear and convincing evidence that the Missouri Supreme Court's factual determination on this issue was unreasonable.

Finally, Johnston analogizes his case to the facts of Williams v. Taylor, 529 U.S. at 362, and argues that this clearly established federal law entitles him to habeas relief. Johnston's argument fails for two reasons. First, Williams is distinguishable from Johnston's case because Williams's trial counsel admitted that lack of preparation, and not trial strategy, resulted in his failure to present much of the mitigating evidence that was left out. In Johnston's case, his attorney testified that he prepared for trial, interviewed many of the witnesses Johnston claims should have testified, and made a decision based on trial strategy not to present those witnesses. Second, the Supreme Court concluded in Williams that the Virginia Supreme Court had misinterpreted and misapplied the Strickland test. In contrast, here the Missouri Supreme Court reviewed Johnston's ineffective-assistance claims using the proper

standard as set forth in Strickland. We recognize the similarities between the evidence not presented on behalf of Taylor and that not presented on behalf of Johnston, but the specific circumstances of Johnston's case do not fall squarely within the Court's decision in Williams and Johnston therefore cannot rely on that decision to garner habeas relief in his case.

We conclude that the Missouri Supreme Court did not unreasonably apply the Strickland standard in concluding that Johnston's ineffective-assistance claim as to this mitigating evidence was without merit. We also conclude that the Missouri Supreme Court did not unreasonably conclude in light of the record that much of the mitigating evidence argued for by Johnston was duplicative of evidence presented. Johnston's claim does not meet the requirements set forth in 28 U.S.C. § 2254 for habeas relief.

## B.

During the penalty phase of Johnston's trial, the State's witnesses collectively testified to four incidents in which Johnston engaged in "violent and threatening behavior." Appellant's Br. at 30. Johnston argues that under Missouri law testimony about these incidents should not have been admitted into evidence, and that his trial counsel was ineffective for failing to object to the wrongful admission of this unconvicted crimes evidence. Again, the claim is governed by Strickland.

We reiterate that, in habeas corpus proceedings, it is not within our province "to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Our role in a § 2254 proceeding is "to review state criminal proceedings for compliance with federal constitutional mandates." Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 403 (2001). Johnston relies on State v. Debler, 856 S.W.2d 641 (Mo. 1993) (en banc), to support his argument to this Court that he is entitled to habeas relief because the prior

unconvicted crimes evidence would not have been admitted if trial counsel had made a timely objection.[4] The Missouri Supreme Court rejected Johnston's claim, and it has squarely rejected the basis for his argument in similar circumstances. See, e.g., State v. Ervin, 979 S.W.2d 149, 158 (Mo. 1998) (en banc) (holding that "the error in Debler was lack of notice" that the state intended to introduce certain prior unconvicted crimes evidence), cert. denied, 525 U.S. 1169 (1999). Because the evidence about which Johnston complains was not objectionable under Missouri law, it was not unreasonable for the Missouri Supreme Court to conclude that Johnston suffered no Strickland prejudice from his counsel's decision not to object to that evidence. Johnston is not entitled to habeas relief on this ground. Compare Kinder, 272 F.3d at 553-54 (holding that failure to object to properly admitted evidence was not deficient performance by trial counsel).

## C.

Johnston's third allegation of ineffective assistance of counsel arises from trial counsel's failure to object to improper portions of the prosecutor's closing arguments during both the guilt and penalty phases of Johnston's trial. The "egregious and obvious nature" of these prosecutorial statements, Johnston argues, should have led his attorney to object, and counsel's failure to object was not justified by reasonable trial strategy. Appellant's Br. at 44. Moreover, Johnston argues that he was prejudiced by counsel's failure to object because many of the improper remarks went directly to whether the jury should find Johnston guilty of first- or of second-degree murder and to whether Johnston should receive the death penalty, and that the Missouri Supreme Court's conclusion to the contrary was an unreasonable application

---

[4]Johnston also makes a Hicks due process argument regarding this claim. We reject that argument in this context for the same reasons we have already set out in addressing another of Johnston's claims. See supra note 3.

of clearly established federal law and an unreasonable determination of the facts in light of the state-court record.

The Missouri Supreme Court discussed four prosecutorial statements to which Johnston's counsel did not object. As to each statement, the court held that the comments were not improper under Missouri law, and that therefore counsel was not ineffective for failing to object to those statements. And, as to the statements challenged by Johnston but not separately discussed in the court's opinion, the court held that Johnston was not prejudiced by counsel's failure to object. Johnston, 957 S.W.2d at 752.

Johnston urges this Court to conclude that the Missouri Supreme Court unreasonably applied Strickland and unreasonably determined the facts in light of the state-court record in ruling against him on these claims. He cites numerous remarks that were allegedly improper and were not objected to by his attorney. Because the trial transcript clearly shows that counsel objected to five of the challenged remarks, we do not consider those as part of Johnston's ineffective-assistance claim.

As to the remaining remarks, Johnston has not directed us to any cases that indicate these remaining remarks are either improper as a matter of federal constitutional law or resulted in sufficient prejudice to merit habeas relief. Our review of the relevant Supreme Court precedent has not revealed any case with facts "materially indistinguishable" so as to bring Johnston's claim within the requirements of 28 U.S.C. § 2254. Moreover, Johnston has not shown that any specific factual finding made by the Missouri Supreme Court was unreasonable in this regard. Johnston therefore is not entitled to habeas relief on this ground.

IV.

Johnston argues that his confession to the murder of his wife should have been suppressed because it was obtained through the exploitation of evidence illegally seized as part of a warrantless exploratory search of Johnston's home after the murder. The Missouri Supreme Court concluded that, although the police were lawfully within Johnston's home in the first instance because he invited them in, the trial court erred in failing to suppress a .22 caliber rifle with a broken stock that was found under the living room sofa because it was not in plain view. The court also concluded that the trial court should have suppressed a bloody pair of blue jeans seized from underneath Johnston's stepson's bed. Johnston, 957 S.W.2d at 744. The court concluded, however, that admission of these illegally seized items into evidence did not require reversal of Johnston's conviction because there was not a reasonable probability that the trial court's error affected the trial's outcome. Johnston, 957 S.W.2d at 744-45. Moreover, the Missouri Supreme Court rejected Johnston's argument that the illegally-seized broken rifle and bloody jeans were used to obtain his confession which therefore should have been suppressed as tainted. Citing testimony from a detective present at Johnston's questioning, the court concluded that Johnston, when confronted with statements of witnesses that conflicted with his story, told the police about the bloody jeans under his stepson's bed before he knew that the police had already discovered them. Thus, the Missouri Supreme Court held, the illegally obtained evidence was not used to obtain a tainted confession from Johnston. Johnston argues that this decision is the result of an unreasonable determination of facts in light of the state-court record and that the court's decision conflicts with clearly established federal law regarding illegally obtained confessions.

In support of his argument that the Missouri Supreme Court unreasonably determined the facts in light of the state-court record, Johnston highlights one

statement made during his trial by the detective who conducted the interview of Johnston that resulted in his confession:

> I had told him I didn't believe him, I thought he was lying, that it's completely inconsistent with what our investigation at the scene shows and the initial interviews with what witnesses had determined.

Trial Tr. vol. V at 1466. In at least two other instances during the same testimony, this detective stated that he told Johnston that his story conflicted with what other witnesses had said about what had occurred. Johnston does not identify any other evidence in the record that contradicts the Missouri Supreme Court's conclusion. We cannot say, on the basis of a single, somewhat ambiguous statement by the detective at trial, that the Missouri Supreme Court unreasonably determined that Johnston had not been confronted specifically with the discovery of the broken rifle or the bloody blue jeans before he confessed. Because that fact stands, the tainted confession cases cited by Johnston do not apply to his claim. The Missouri Supreme Court therefore did not reach a conclusion contrary to clearly established federal law in refusing to find that Johnston's confession was illegally obtained or erroneously admitted at trial.

V.

Johnston argues that the District Court wrongfully denied his request for an evidentiary hearing on his § 2254 petition. A habeas petitioner is entitled to an evidentiary hearing in federal district court under circumstances narrowly circumscribed by the provisions of 28 U.S.C. § 2254(e)(2). That section, one of the changes enacted by Congress as part of AEDPA, provides that where a habeas petitioner "has failed to develop the factual basis of a claim in State court proceedings," the district court cannot hold an evidentiary hearing unless the petitioner shows that his case falls within one of two exceptions. Id. Of course, the initial inquiry must be whether the petitioner failed to develop his claim in state court.

-15-

"[A] petitioner cannot be said to have 'failed to develop' relevant facts if he diligently sought, but was denied, the opportunity to present evidence at each stage of his state proceedings." Breedlove v. Moore, 279 F.3d 952, 960 (11th Cir. 2002).

Johnston requested a hearing in the District Court to develop two claims: that illegally seized evidence was admitted during the penalty phase of his trial, violating his Fourth, Eighth, and Fourteenth Amendment rights; and that further evidence, not yet part of the record, was available to support his claim of ineffective assistance of counsel based on mitigating evidence not presented during the penalty phase of his trial. The District Court denied Johnston's request for an evidentiary hearing, concluding that "no ground of the petition requires further evidentiary development for its resolution." Johnston, 119 F. Supp. 2d at 996. The court reasoned that "petitioner fails to demonstrate that an evidentiary hearing is warranted under the applicable standards enunciated in 28 U.S.C. § 2254(e)(2)." Id. We review the District Court's decision for an abuse of discretion.[5] See Hunter v. Bowersox, 172 F.3d 1016, 1025 (8th Cir. 1999), cert. denied, 528 U.S. 1140 (2000). For purposes of resolving his claim, we accept as true Johnston's contention that he diligently pursued development of his claims in the state-court proceedings. Therefore, although we assume that § 2254(e)(2) does not bar the District Court from granting an evidentiary hearing, we may still "deny [Johnston] an evidentiary hearing if such a hearing would not assist in the resolution of his claim." Breedlove, 279 F.3d at 960; accord Bolender v. Singletary, 16 F.3d 1547, 1555 n.9 (11th Cir.), cert. denied, 513 U.S. 1022 (1994). In other words, even if the facts Johnston seeks to prove are true, if those facts would not entitle him to relief (that is, if those facts would not show that

_____

[5]The State argues that we are barred from addressing this claim because the denial of an evidentiary hearing may not be reviewed on appeal pursuant to 28 U.S.C. § 2254(c) (exhaustion of state remedies). The State's argument is completely without merit. See, e.g., Parker v. Kemna, 260 F.3d 852, 854 (8th Cir.) (addressing on the merits district court's denial of an evidentiary hearing to § 2254 petitioner), cert. denied, 122 S. Ct. 657 (2001).

the Missouri Supreme Court acted contrary to or unreasonably applied clearly established federal law), then the District Court did not abuse its discretion in denying Johnston's request for an evidentiary hearing.

Johnston argues that he needs an evidentiary hearing to develop the facts supporting his claim that an illegally seized revolver and ammunition were erroneously allowed into evidence during the penalty phase of his trial. Johnston admits in his brief that, when offered into evidence by the State, the trial court excluded the revolver and the ammunition "because the state failed to connect the items to Mr. Johnston." Appellant's Br. at 47. The jury may have seen the gun and the ammunition before the trial court ruled, as Johnston alleges, but that fact alone does not establish that Johnston suffered any prejudice thereby entitling him to a mistrial or other relief. See, e.g., United States v. Lee, 886 F.2d 998, 1002 (8th Cir. 1989), cert. denied, 493 U.S. 1034 (1990); United States v. Woods, 613 F.2d 629, 635 (6th Cir.), cert. denied, 446 U.S. 920 (1980); Pilgrim v. Sigler, 440 F.2d 788, 789-90 (8th Cir.), cert. denied, 404 U.S. 937 (1971). The Missouri Supreme Court concluded in this regard that "[s]ustaining the objection signaled to the jury the impropriety of the State's attempt to use this evidence." Johnston, 957 S.W.2d at 750. Johnston has not shown how the facts of this claim would entitle him to any relief even if he were allowed to develop them at an evidentiary hearing. In truth, we are uncertain, based on Johnston's brief, what facts Johnston would seek to prove at the hearing. Nevertheless, because the evidence was not actually admitted, we can see no basis upon which to conclude that the District Court abused its discretion in denying Johnston's request for an evidentiary hearing on this claim.

Johnston also argues that he is entitled to an evidentiary hearing to further develop his ineffective-assistance-of-counsel claim regarding trial counsel's failure to present mitigating evidence of Johnston's mental health and diminished mental capacity. During his state post-conviction proceedings, the motion court denied permission to transfer Johnston from the correctional facility to a hospital so that he

could receive an MRI arranged for by post-conviction counsel. Johnston claims that this evidence is necessary to prove that he received ineffective assistance of counsel.

We disagree. The record already contains all the facts necessary to resolve this ineffective-assistance claim. At the post-conviction relief hearing, Johnston's counsel testified that he had mental health experts examine Johnston, that he relied on his experts to request further testing when indicated, and that those experts did not request that an MRI be performed. One expert's report even stated that the expert's examination revealed no evidence of gross brain damage. These facts provide a sufficient basis upon which to resolve Johnston's ineffective-assistance claim. Johnston apparently wishes to present evidence that he in fact suffers from organic brain damage. But whether he is actually brain-damaged is not relevant at this stage of his post-conviction proceedings to the question of whether his trial counsel effectively represented him during the penalty phase of his trial. As we have said, trial counsel's decisions about what investigative steps to take were limited by reasonable decisions about trial strategy.[6] Because as a matter of law the existing record was sufficient for the District Court to decide Johnston's claim, no further evidentiary development was required, and the court did not abuse its discretion when it denied Johnston's request for an evidentiary hearing on this issue.

---

[6]Johnston's argument leaps over the ineffectiveness question and addresses as an initial matter the question of prejudice. Evidence that Johnston suffers from organic brain damage might be relevant to the prejudice question, but we do not need to reach that question absent a showing that trial counsel's representation fell below that level required by the Constitution. Johnston has not shown that the Missouri Supreme Court unreasonably concluded that his counsel met that constitutional standard in regard to mitigating evidence of his mental health.

-18-

VI.

Having considered all of the claims raised in Johnston's appeal, we affirm the District Court's denial of Johnston's petition for habeas corpus relief.

HEANEY, Circuit Judge, dissenting.

Although I concur in the majority's opinion to the extent that it denies relief on the issues raised in the guilt phase of Johnston's trial, I believe that Johnston was denied effective assistance of counsel at the penalty phase of his trial. Therefore, I respectfully dissent and would remand for a new penalty phase trial only.

Throughout Johnston's trial, the state portrayed him as a violent, evil individual who deserved the death penalty. The state focused on the appalling circumstances surrounding the murder of Nancy Johnston, and on several prior incidents during which Johnston exhibited violent behavior. By the time the penalty phase of Johnston's trial was completed, the jury was aware that Johnston: (1) allegedly damaged a car, overturned a motorcycle, and threatened his brother in November, 1985; (2) assaulted and threatened to kill his girlfriend in September, 1987; (3) pointed a shotgun at police and threatened to kill police officers in September, 1987; (4) fought with and threatened to kill police officers in December, 1988; and (5) fought with police, and threatened to kill his wife in early 1989.

The state also sought to sway the jury by making what I consider to be improper, inflammatory remarks. Among other things, the state referred to Johnston as a "murderous animal," "the embodiment of evil," and "Satan" as it encouraged the jury to give him the death sentence. While I do not feel that these statements "so infected the trial with unfairness as to make the resulting conviction a violation of due

-19-

process," <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974), they are nonetheless important because they contributed to the negative perception of Johnston.

By the time the prosecution was finished, the jury's perception of Johnston could not have been worse. Mitigating evidence was needed to soften the prosecution's portrayal of Johnston as a "murderous animal" and to provide some sort of explanation for his violent behavior at the time of the murder. Yet, despite the availability of evidence that attributed Johnston's violent behavior to diminished mental capacity, alcohol dependency, and organic personality disorder, Johnston's counsel failed to present this evidence to the jury. Instead, counsel presented the testimony of eleven lay witnesses who collectively testified that Johnston: (1) was a model prisoner; (2) had a difficult childhood; and (3) had a problem with alcohol, and acted violently when inebriated. While this evidence may have helped the jury to view Johnston as something other than "the embodiment of evil," it did not explain his violent behavior.

The majority correctly notes that Johnston's counsel made a tactical decision to refrain from introducing additional mitigating evidence. The relevant question however is not only whether counsel's choices were strategic, but whether they were reasonable. <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 479 (2000) (<u>citing</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984)). Here, clearly they were not. There is just no strategy that satisfactorily supports counsel's inaction.

Had counsel introduced the evidence that was available, the jury would have been aware that Johnston may be incapable of controlling his anger. Dr. Sam Parwatikar, who was appointed by the court to conduct a pretrial evaluation of Johnston, testified in a deposition that Johnston's medical records revealed a history of head injuries, borderline personality, and alcohol abuse. Dr. Parwatikar further testified that these conditions were likely to have made Johnston sensitive to minor altercations, and susceptible to the loss of inhibition associated with the use of

-20-

alcohol and drugs. In Dr. Parwatikar's opinion, Johnston was suffering from extreme emotional and mental duress at the time of the murder and his ability to deliberate and conform his behavior to the requirements of the law was substantially impaired.[7]

The Missouri Supreme Court held that counsel's decision to refrain from calling Dr. Parwatikar to testify was appropriate because Dr. Parwatikar's report contained references to Johnston's stormy relationship with his wife, his inability to hold his temper when he drank, including an incident where Johnston threatened his wife by putting a gun to her head while she was driving, and numerous drunk driving convictions. The court also concluded that Dr. Parwatikar's testimony was suspect because it was based on Johnston's inaccurate account of the murder. I disagree.

Dr. Parwatikar's testimony regarding Johnston's mental state and ability to conform his behavior to the requirements of the law at the time of the murder are suspect because they are based upon Johnston's own version of the circumstances surrounding the murder. But Dr. Parwatikar's conclusions about the behavioral impact of head injuries, borderline personality, and alcohol abuse are not based on Johnston's assertions; these conditions are well documented in his medical records. Further, Dr. Parwatikar would not have further tainted the jury's negative perception of Johnston by testifying about threats to his wife or drunk driving convictions because the jury was already aware of Johnston's extensive violent history.

In addition to Dr. Parwatikar's testimony, counsel failed to present the testimony of Dr. Sean Yutzy, who performed a psychiatric evaluation of Johnston in 1990. Dr. Yutzy would have testified about Johnston's history of head injuries and

---

[7]On cross-examination Dr. Parwatikar agreed that Johnston did not suffer from a mental disease or defect at the time of the murder, and that Johnston was competent to stand trial. Dr. Parwatikar also conceded that he knew of a variety of instances where Johnston acted violently or engaged in criminal behavior in the past. This testimony led Johnston's counsel to refrain from calling Dr. Parwatikar to testify.

his alcohol addiction. Dr. Yutzy would have also testified that Johnston suffered from the after-effects of prior head injuries and from an antisocial personality disorder. Dr. Yutzy opined that Johnston's chaotic relationship with his wife, his emotional disturbance at the time of the offense, and his inability to appreciate the criminality of his conduct were all related to the personality disorder. Although Dr. Yutzy's report cited numerous incidents of violent behavior on the part of Johnston, including threats to kill his wife, and was partially based on inaccurate facts, it supported Dr. Parwatikar's theory that head injuries and alcohol abuse contributed to Johnston's violent behavior.

Johnston's counsel also failed to present the testimony of Dr. Fred Gaskin, who maintained a private psychiatric relationship with Johnston from 1988 to 1989. Dr. Gaskin diagnosed Johnston as being alcohol dependent and as suffering from a history of head trauma. Dr. Gaskin opined that these injuries caused symptoms that were consistent with post trauma head syndrome, or organic brain syndrome, which is characterized by the impairment of brain functions. The Missouri Supreme Court opined that Dr. Gaskin's conclusions were faulty because they were based on Johnston's own version of his life, and because Dr. Gaskin did not attempt to corroborate his data using independent sources. However, there was nothing to suggest that Johnston lied about the events of his life during his relationship with Dr. Gaskin, and Johnston's history of head injuries and alcohol abuse is well documented.

The evidence elicited during trial portrayed Johnston in an extremely negative manner. Johnston's counsel was obligated to present any available mitigating evidence in an attempt to spare his life. The jury was fully aware that Johnston was a man with a violent past. What the jury lacked was a credible and available explanation for his violent behavior. The testimony of the three doctors together would have provided a credible explanation. Counsel's decision to keep this mitigating evidence from the jury was not reasonable because the jury had virtually no reason to conclude that the death penalty was not warranted, and because there is

-22-

a substantial likelihood that at least one juror would have voted against the imposition of the death penalty had the mitigating evidence been introduced. This would have allowed the trial judge to resolve the ensuing deadlock by sentencing Johnston to a term of life imprisonment without the possibility of parole.

For these reasons, I would remand to the trial court for a new penalty phase trial.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.